# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE<br>1101 Vermont Ave NW, Suite 710<br>Washington, DC 20005,<br><br>                Plaintiff,<br>   v.<br><br>TRAVELERS INDEMNITY COMPANY<br>One Tower Square<br>Hartford, CT 06183<br><br>and<br><br>TRAVELERS CASUALTY INSURANCE<br>COMPANY OF AMERICA<br>One Tower Square<br>Hartford, CT 06183,<br><br>                Defendants. | Case No. __16-cv-928__<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

## NATURE OF ACTION

1.  Plaintiff National Fair Housing Alliance ("Plaintiff" or "NFHA"), a national organization dedicated to ending discrimination in housing, brings this action against Defendants Travelers Indemnity Company and Travelers Casualty Insurance Company of America ("Defendants" or "Travelers") for declaratory, injunctive, and monetary relief based on Travelers' unlawful discrimination in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.* (the "FHA"), and the District of Columbia Human Rights Act of 1977, D.C. Code Ann. § 2-1402.21 (2011) (the "DCHRA").

2.  Defendants and their property casualty affiliates use insurance underwriting criteria that deny or impose different terms and conditions for commercial habitational insurance

to landlords who lease their residential rental units to tenants that rely on the federal Housing Choice Voucher program to help pay their rent.

3. Defendants' use of discriminatory underwriting and eligibility criteria constitutes unlawful discrimination based on source of income, as prohibited by the DCHRA. In addition, these underwriting criteria have a disparate impact on African Americans on the basis of race and female-headed households on the basis of sex, in violation of both the FHA and the DCHRA. Furthermore, they have a disproportionately negative effect on the District of Columbia's predominantly African-American neighborhoods, which are statistically more likely to have buildings occupied by tenants in the Housing Choice Voucher program in the District of Columbia, which is both racially discriminatory and a violation of the DCHRA's prohibition on discrimination based on the place of residence or business of an individual.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613(a), 28 U.S.C. § 1343, and 28 U.S.C. § 2201. Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims brought under District of Columbia law because they are related to Plaintiff's federal claims and arise out of a common nucleus of related facts. In addition, the Court has diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Plaintiff is headquartered and operates in the District of Columbia, Defendants conduct business in the District of Columbia, and because the ongoing events giving rise to the claims alleged herein occurred and continue to occur within the District of Columbia.

# PARTIES

6. Plaintiff NFHA is a national, nonprofit, public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, DC.  NFHA is a nationwide alliance of private, nonprofit, fair housing organizations, including organizations in 28 states.  NFHA's sole mission is to end discrimination in housing based on race, sex, and other protected classes covered by the FHA and state and local fair housing laws, and to promote residential integration.  NFHA works to eliminate housing discrimination and to ensure equal opportunity for all people through leadership, education and outreach, membership services, public policy initiatives, advocacy, investigation of fair housing violations, and enforcement.

7. Defendant Travelers Indemnity Company is an insurance company incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.  Travelers Indemnity Company and its property casualty affiliates, including Defendant Travelers Casualty Insurance Company of America, underwrite habitational insurance policies for commercial rental properties in the District of Columbia.  Travelers Indemnity Company is a registered insurer with the District of Columbia Department of Insurance, Securities and Banking.

8. Defendant Travelers Casualty Insurance Company of America is an insurance company incorporated under the laws of the State of Connecticut with its principal place of business in the State of Connecticut.  Travelers Casualty Insurance Company of America underwrites habitational insurance policies for commercial rental properties in the District of Columbia.  Travelers Casualty Insurance Company of America is a registered insurer with the District of Columbia Department of Insurance, Securities and Banking.

## FACTUAL ALLEGATIONS

### *Housing Choice Voucher Program Overview*

9. The federal Housing Choice Voucher program is the federal government's major program for assisting very low-income families, the elderly, and individuals with disabilities in affording decent, safe, and sanitary housing in the private rental market.

10. Congress established the Housing Choice Voucher program (formerly known as the Section 8 Existing Housing Program) as part of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, Title II, § 201(a), 88 Stat. 633, 662-66, now codified at 42 U.S.C. § 1437f, and Housing Community Development Act of 1987, Pub. L. No. 100-242, § 143, 101 Stat. 1814, 1850 (1988), codified as amended at 42 U.S.C. § 1437f(o); *see also* 24 C.F.R. §§ 982.1 *et seq.*

11. The United States Department of Housing and Urban Development ("HUD") provides Housing Choice Voucher program funding to local public housing authorities ("PHAs"), which administer the Housing Choice Voucher program locally and issue vouchers to qualified individuals and families. The District of Columbia Housing Authority ("DCHA") is the local PHA that administers the Housing Choice Voucher program for qualified District of Columbia residents.

12. Participants in the Housing Choice Voucher program use vouchers to find their own housing in the private rental market, including single-family homes, townhouses, and apartments. Participants are free to choose any housing that meets the program's requirements and are not limited to units located in subsidized housing projects. A housing subsidy is paid to the landlord directly by the PHA on behalf of the participant. The participant then pays the difference between the actual rent charged by the landlord and the amount subsidized by the

program. District of Columbia participants, on average, pay approximately 30 percent of their household income on rent and DCHA pays the rest of the rent directly to the landlord.

13. Monetary assistance provided to an owner of a housing accommodation under the Housing Choice Voucher program, either directly or through a tenant, is considered a source of income under the DCHRA.

*Housing Choice Voucher Program Participating Households in the District of Columbia are Disproportionately African-American and Female-Headed*

14. The District of Columbia has a current estimated population of 672,228 people. The population is approximately 48.7 percent African American or Black (not Hispanic) and 35.4 percent White (not Hispanic). There are an estimated 271,896 households in the District of Columbia, which are an estimated 45.2 percent African American or Black (not Hispanic) and 41.0 percent White (not Hispanic). In addition, approximately 47.1 percent of all households in the District of Columbia are female-headed households.

15. An estimated 10,993 households in the District of Columbia currently participate in the Housing Choice Voucher program.

16. In the District of Columbia, African-American households and female-headed households are overrepresented in the households participating in the Housing Choice Voucher program. Whereas African-American/Black households comprise 45.2 percent of all households in the District, they make up 92.0 percent of Housing Choice Voucher program participants. In contrast, only 1.0 percent of participating households are White (not Hispanic), although white households comprise 41.0 percent of all households in the District. Similarly, female-headed households comprise 47.1 percent of all households in the District, but make up 81.5 percent of households participating in the Housing Choice Voucher program. In contrast, male-headed

5

households comprise 52.9 percent of the District's population, but just 18.5 percent of Housing Choice Voucher households.

17. District of Columbia residents who participate in the Housing Choice Voucher program are largely concentrated in predominantly African-American neighborhoods. According to a 2014 report by the Center for Regional Analysis at George Mason University, the four Census tracts in the District with the highest concentration of Housing Choice Voucher program participants are all east of the Anacostia River, as are eight of the top ten Census tracts. The Census tracts with high concentrations of Housing Choice Voucher program participants have an 84.7 percent African-American/Black population, compared to just 51.1 percent District-wide.

*Defendants Refuse to Underwrite Property Insurance Policies for*
*Rental Properties with Housing Choice Voucher Program Participants*

18. Travelers is one of the largest underwriters of property insurance policies in the District of Columbia and the District of Columbia metropolitan area.

19. Travelers is a standard carrier regulated by and authorized to underwrite insurance policies in the District of Columbia.

20. In recent years, NFHA learned that some insurance carriers have refused to underwrite habitational insurance policies for rental properties with tenants participating in the Housing Choice Voucher program across the country. To investigate whether these practices were occurring in the District of Columbia, in 2015, NFHA commenced testing of insurers and insurance brokers. Through this testing, NFHA sought to assess whether insurers' policies, procedures, and practices for underwriting habitational insurance policies in the District for rental buildings with Housing Choice Voucher program participants were discriminatory.

21. Between July 2015 and February 2016, NFHA conducted testing of five insurance agencies doing business in the District of Columbia that market Travelers insurance policies. NFHA conducted testing of the Rust Insurance Agency, LLC in Washington, DC, beginning in July 2015; Tucker Insurance Service, Inc. in Falls Church, Virginia, beginning in September 2015; Inter Group Insurance in Falls Church, Virginia, with two separate tests beginning in January 2016 and February 2016; Flather & Perkins, Inc. in Washington, DC, beginning in January 2016; and Howard Eales, Inc. in Washington, DC, beginning in January 2016.

22. NFHA coordinated each of the tests and provided a common set of instructions to the individual testers. The telephone tests were recorded.

23. Each of the tests was conducted by an experienced tester employed by NFHA. In each test, the tester posed as a prospective purchaser of a four-unit apartment complex in the Anacostia neighborhood in southeast Washington, DC, who was seeking information and quotes for habitational insurance for that property. After providing information on the building and requesting habitational insurance information and a quote, the testers advised each broker that the complex was currently occupied by tenants participating in the Housing Choice Voucher program. In each case, the tester was ultimately told by the broker that Travelers would not underwrite the policy because of the presence of voucher recipients in the building. The brokers either provided this information right away based on knowledge of Travelers' policies and practices, or in a follow-up communication with the tester after the broker's consultation with a Travelers representative.

24. In July 2015, NFHA's tester contacted Rust Insurance Agency and spoke with a broker at that agency. In the initial telephone call, the tester and the broker had a lengthy discussion about the building, its condition, its construction and renovation dates, occupancy,

and other information. During the call, the tester informed the broker that the building was occupied by tenants participating in the Housing Choice Voucher program. The broker advised the tester that she would send him an application and would shop the application around to several potential carriers. However, the broker further informed the tester that Travelers did not underwrite habitational insurance policies for buildings with tenants in the Housing Choice Voucher program, and that she would therefore not request a quote from Travelers "to save time." After the call, the broker emailed the tester application materials.

25.     Several days after the initial call, the tester made a follow-up call to the Rust Insurance Agency broker. The broker told the tester that once she received his application, she would forward it to an excess and surplus lines broker, who would shop the application around to carriers who do "these types of subsidized housing." Excess and surplus line carriers typically underwrite insurance policies that standard carriers will not cover. When the tester asked whether she planned to send his application to Travelers, the broker responded that she would not send it to Travelers because Travelers "won't write subsidized housing policies."

26.     In September 2015, a NFHA tester contacted Tucker Insurance Service, Inc. by telephone and spoke with a broker at that agency. In their first conversation, the tester informed the broker that he was seeking a quote for a property insurance policy for a rental property he planned to purchase. In response to the broker's questions, the tester provided the broker the address of the building, the sales price of the building, the dates of the building's construction and last major renovations, and the number of units in the building. Based on this information, the broker volunteered that Travelers should be able to underwrite the policy for the building and that the property should be eligible for a policy from a standard carrier. The broker advised the tester that he would check with his Travelers underwriter and get back to him later to confirm.

The tester did not inform the broker during the initial call that the subject property was occupied by Housing Choice Voucher program tenants.

27. Later that morning, the broker called and left the tester a voicemail, stating that he got a quote for the building. When the tester called the broker back shortly thereafter, the broker told the tester that Travelers would underwrite a policy for the building, and that the premium would be between $3000 and $3500 depending on the options selected for the policy, such as coverage and deductible amounts. At that point, the tester informed the broker that all four apartments in the building were currently rented by tenants receiving Housing Choice Vouchers. The broker responded, "Wait a minute. Stop right there. Subsidized housing is a problem." The broker stated that he was not sure whether Travelers would underwrite the policy, but that, "if all four [units in the building] have subsidized housing, doubting they'll want to do it, quite honestly." The broker continued by saying that, if a standard carrier like Travelers would not underwrite the policy, a secondary market insurer might do so for a premium of $4000 to $5000 per year. The broker confirmed to the tester that the premium on a policy from a secondary market carrier would be significantly higher than the quote he had provided for Travelers.

28. The next day, the Tucker Insurance broker called back the tester and left a voicemail, in which he stated that he spoke with a Travelers representative, that "any Section 8 would be a problem," and that Travelers would not underwrite a policy for that apartment building. In the message, the broker added that the tester would likely need to get a policy from the secondary market, which would probably have a premium of about $4500 per year. The broker noted that it would be "not as good a policy" and that the tester would be "paying more for less" than he would get under a Travelers policy.

29. Later that day, the tester called the Tucker Insurance broker and spoke to him on the phone. The broker reiterated what he had said in his voicemail, adding that because the building has Housing Choice Voucher program tenants, "Travelers doesn't want any part of it." The broker again stated that the tester could seek a policy from excess and surplus lines markets, but that the premium would be at least $1000 higher than the quoted Travelers policy. He explained that excess and surplus lines policies carry additional risk because, unlike a policy with a standard carrier like Travelers, those carriers are not regulated by the District of Columbia and the District's guarantee of coverage in the event the carrier went bankrupt would not apply.

30. NFHA conducted two tests of Inter Group Insurance in January and February 2016. During each test, a commercial lines agent for Inter Group told NFHA's tester that Travelers would not underwrite a habitational insurance policy for an apartment building because of the occupancy by Housing Choice Voucher program tenants.

    a. In the first test, commenced in January 2016, the tester informed an Inter Group broker that she was looking to purchase the four-unit building described above through her limited liability corporation. The tester was later contacted by a commercial lines broker from Inter Group, who gathered information about that building. The tester told that broker that the building's four tenants were all Housing Choice Voucher program participants. After a series of phone calls and emails to exchange information, the broker indicated that she was unable to locate a quote for the tester because 100 percent of the building's tenants used Housing Choice Vouchers. The agent specifically indicated that Travelers would

       not insure the building because there were tenants participating in the Housing Choice Voucher program.

   b.   In the second test, commenced in February 2016, a NFHA tester told a commercial lines broker at Inter Group that he was seeking a habitational insurance policy for a five-unit building he intended to purchase through his limited liability corporation.  After the tester informed the broker that all of the tenants in the building used Housing Choice Vouchers, the agent indicated that Travelers would not insure the property.

### *Harm to Plaintiff*

<u>Diversion of Resources and Frustration of Mission</u>

31.    Travelers' discriminatory and unlawful practices have frustrated and continue to frustrate NFHA's mission of ensuring that all people have equal access to housing opportunities in the District of Columbia and across the country.

32.    Travelers' use of underwriting criteria that either compel landlords to refuse to accept tenants participating in the Housing Choice Voucher program or restrict landlords' ability to rent to such tenants raises issues central to NFHA's mission of combating housing discrimination and promoting residential integration.  Over the last year, and prior to the filing of this Complaint, NFHA has diverted its scarce resources and staff from other activities to investigating and counteracting the underwriting criteria employed by Travelers, because those practices constitute unlawful discrimination on the basis of source of income and have a disparate impact on statutorily-defined protected classes.

33.    NFHA devoted considerable staff time and resources to efforts to identify the nature and scope of Traveler's discriminatory conduct.

34. Because the core aspects of NFHA's mission are to combat housing discrimination and promote residential integration, that mission is frustrated when an insurance company imposes additional, discriminatory impediments that make it more difficult and more expensive for landlords to accept Housing Choice Vouchers.  Specifically, NFHA's mission is frustrated by Travelers' discriminatory underwriting criteria alleged in this Complaint, as these policies and practices violate federal and District of Columbia fair housing laws, undermine rather than advance equal housing opportunities, perpetuate the harms of residential segregation, and impose disproportionate injuries on the District's low-income African-American households and female-headed households.  Travelers' refusal to write property and casualty insurance for landlords with tenants participating in the Housing Choice Voucher program is the equivalent of, and has the same effect as, a refusal to write insurance for landlords because they rent to a higher proportion of households that are African-American/Black or female-headed households.  Travelers' discriminatory policies also harm the neighborhoods in which African-American/Black residents are statistically more likely to live, and impermissibly "red line" those neighborhoods by making habitational insurance more costly and more difficult or impossible to obtain.  These harms all run counter to NFHA's central goals.

35. To address and attempt to counteract the effects of Defendants' discriminatory conduct, prior to the filing of this action, NFHA has engaged in a community outreach and a public education campaign to raise awareness of these discriminatory practices among Housing Choice Voucher program participants, landlords, and policy makers in the District of Columbia, including the following activities.

    a. NFHA added educational information to its website, along with links to the federal Fair Housing Act and DCHRA, specifically designed to

    educate the general public (including landlords and tenants who participate or who may participate in the Housing Choice Voucher program) about fair housing laws and habitational insurance discrimination based on Housing Choice Voucher program participation. The content was added to the NFHA website on February 3, 2016 and remains on the website.

b. NFHA placed a public service announcement in the Washington, DC print edition of the *Afro-American*, a local weekly newspaper, for two weeks in the February 6-12, 2016 and February 13-19, 2016 editions of that newspaper. In addition, NFHA sponsored an e-news blast for *Afro-American* readers, which was sent out by email on or about February 11, 2016. The public service announcement and e-news blast were both designed to educate the public about the fair housing laws in the habitational insurance context, including the types of discriminatory conduct at issue in this Complaint.

c. NFHA mailed an educational letter and flyers to predominantly African American churches in the Washington, DC area on two occasions in early 2016 for purposes of educating landlords and tenants who participate in the Housing Choice Voucher program about the type of discriminatory underwriting practices maintained by Travelers. The first mailing, on February 4, 2016, was sent to 82 churches and included an educational cover letter, 15 copies each of an educational flyer targeted to landlords, and 15 copies of a second educational flyer targeted to tenants

participating in the Housing Choice Voucher program. The second mailing, on March 1, 2016, was sent to 23 of the larger predominantly African-American churches in the Washington, DC area, and included one copy of each flyer.

d.  NFHA has also taken steps to educate DCHA and its participating landlords about insurance discrimination based on Housing Choice Voucher program participation. On February 10, 2016, Shanna Smith, NFHA's President and CEO, addressed DCHA's Board of Commissioners during its monthly board meeting. During her remarks, Ms. Smith discussed the very types of discriminatory underwriting practices raised in this Complaint.

e.  In addition, on February 9, 2016, Rachael Deane, NFHA's Associate Director of Enforcement, spoke with Ronald McCoy, Director of the DCHA's Housing Choice Voucher Program. Ms. Deane provided information to Mr. McCoy about the discriminatory insurance behavior that NFHA has observed in the habitational insurance market, including a description of how the discriminatory practice may affect housing providers who participate in the Housing Choice Voucher Program and how the practice limits the availability of housing for tenants participating in the Housing Choice Voucher program. Ms. Deane informed Mr. McCoy that such behavior violates the FHA and DCHRA. Ms. Deane also described how such conduct has an unlawful disparate impact in the District of Columbia. Ms. Deane described the relevant provisions of the

        FHA and explained that landlords are protected under this statute. Ms. Deane later followed up with an email to Mr. McCoy on March 1, 2016, which attached the educational flyers aimed at tenants and landlords described above.

    f.    In addition, in order to prepare for the possibility of landlords and tenants calling NFHA for additional information about insurance discrimination, NFHA prepared a telephone call intake log and briefed staff about handling incoming calls at its February 2016 staff meeting.

36. Each of these activities required the diversion and expenditure of financial resources and staff time, including: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct these outreach activities.

## CAUSES OF ACTION

### First Cause of Action

**Discrimination Based on Race, Sex, Source of Income, and Place of Residence or Business of an Individual in Violation of the D.C. Human Rights Act of 1977, D.C. Code Ann. § 2-1402.21 (2011)**

37. Plaintiff realleges and incorporates by reference paragraphs 1 to 36 of this Complaint.

38. Travelers' policy and practice of using the presence of tenants participating in the Housing Choice Voucher program as an underwriting criterion for property insurance of rental properties in the District of Columbia violates the D.C. Human Rights Act's prohibition on housing discrimination based on race, sex, source of income, and place of residence or business of an individual by:

15

      a.    interrupting or terminating, or refusing or failing to initiate or conduct any transaction in real property, or requiring different terms for such transaction, or representing falsely that an interest in real property is not available for transaction;

      b.    including in the terms or conditions of a transaction in real property, any clause, condition, or restriction;

      c.    refusing to provide title or other insurance relating to the ownership or use of any interest in real property;

      d.    making, printing, or publishing, or causing to be made, printed, or published any notice, statement, or advertisement, with respect to a transaction, or proposed transaction, in real property, or financing relating thereto, which notice, statement, or advertisement unlawfully indicates or attempts unlawfully to indicate any preference, limitation, or discrimination based on race, national origin, sex, or source of income; and

      e.    discriminating in any financial transaction involving real property, on account of the location of residence or business (*i.e.*, "red-lining").

39.    Travelers' insurance underwriting criteria deny coverage for housing where individuals and households participating in the Housing Choice Voucher program reside, compelling landlords to leave their buildings with participating tenants uninsured or to obtain inferior, significantly more expensive coverage on the secondary excess and surplus market. In doing so, Travelers discriminates on the basis of source of income—namely, participation in the Housing Choice Voucher program. Furthermore, Travelers' use of discriminatory insurance

underwriting criteria actually or predictably results in a significantly disproportionate impact on African Americans on the basis of race, and female-headed households on the basis of sex. These underwriting criteria have harmed and continue to impose disproportionate harm on these groups because each group is more likely to participate in the Housing Choice Voucher program in the District of Columbia than are the relevant non-protected groups.

40. Travelers' underwriting criteria also predictably and disproportionately harm neighborhoods in the District of Columbia where African-American/Black households are statistically more likely to live.

41. Similarly, Travelers' criteria have a disproportionate harm on neighborhoods statistically more likely to have rental buildings with tenants participating in the Housing Choice Voucher program, as landlords must go without property insurance, pay higher premiums for secondary market policies, and receive fewer benefits and protections from those non-standard policies. These policies and practices therefore constitute impermissible "red-lining" of such neighborhoods in violation of the DCHRA's prohibition on discrimination based on the place of residence or business of any individual.

42. Travelers' underwriting criteria do not have a substantial, legitimate, nondiscriminatory purpose. Even if Travelers utilizes these underwriting criteria for some business purpose, other, less discriminatory alternatives are and have been available to Travelers to achieve those objectives.

43. NFHA has been injured by Travelers' discriminatory conduct and has suffered damages as a result.

44. Travelers' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## Second Cause of Action

### Discrimination Based on Race and Sex in Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

45. Plaintiff realleges and incorporates by reference paragraphs 1 to 44 of this Complaint.

46. As set forth above, Travelers' underwriting criteria deny coverage or inflate the price of coverage for housing where individuals and households participating in the Housing Choice Voucher program live.

47. As a result, Travelers' use of discriminatory underwriting criteria actually or predictably results in a significantly disproportionate impact on the basis of race (for African-American/Black individuals and households) and sex (for female-headed households).

48. Travelers' underwriting criteria, if facially neutral, have had and continue to have a discriminatory impact on African-American/Black individuals and households, and female-headed households in the District of Columbia, in violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. Travelers' underwriting criteria predictably and disproportionately harm these groups because they are each more likely to participate in the Housing Choice Voucher program in the District of Columbia than are the relevant non-protected groups.

49. Travelers' underwriting criteria also predictably or disproportionately harm neighborhoods in the District of Columbia where African-American/Black households are statistically more likely to live.

50. Travelers' underwriting criteria do not have a substantial, legitimate, nondiscriminatory objective. Even if Travelers utilizes these underwriting criteria for some

business purpose, other, less discriminatory alternatives are and have been available to Travelers to achieve those objectives.

51.     NFHA has been injured by Travelers' discriminatory conduct and has suffered damages as a result.

52.     Travelers' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff National Fair Housing Alliance respectfully requests that judgment be entered against Defendants Travelers Indemnity Company and Travelers Casualty Insurance Company of America as follows:

(a)     Declaring that Defendants' policies and practices alleged herein violate the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1402.21 (2011), and the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*;

(b)     Permanently enjoining Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, from refusing to insure, or canceling the insurance of, or charging higher rates to, landlords on the basis that they rent to tenants who participate in the Housing Choice Voucher program;

(c)     Requiring Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, to develop and implement policies, practices, and procedures that do not discriminate against persons protected by District of Columbia and federal fair housing laws;

(d)     Awarding all available damages to Plaintiff, including, but not limited to, compensatory damages, as well as punitive damages in an amount that would punish Defendants

for the willful, wanton, and reckless conduct alleged herein, and that would effectively deter similar conduct in the future;

    (e)    Awarding reasonable attorneys' fees and costs under D.C. Code § 2-1403.13 and 42 U.S.C. § 3613(c); and

    (f)    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury as to all issues in this case.

Dated: May 17, 2016

Respectfully submitted,

/s/ Megan Cacace
Stephen M. Dane*
Megan Cacace (D.D.C. Bar No. 981553)
Joseph J. Wardenski*
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)
sdane@relmanlaw.com
mcacace@relmanlaw.com
jwardenski@relmanlaw.com

Morgan Williams*
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Avenue NW, Suite 710
Washington, D.C. 20005
(202) 898-1661
mwilliams@nationalfairhousing.org

*Pro hac vice admission to be sought*