## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL FAIR HOUSING ALLIANCE,** | |
| **Plaintiff,** | |
| v. | **Civil Action No.  16-928 (JDB)** |
| **TRAVELERS INDEMNITY COMPANY,** et al. | |
| **Defendants.** | |

## MEMORANDUM OPINION

This case raises an oft-litigated Fair Housing Act claim: whether an insurer's facially-neutral policy has a disparate impact on the availability of housing for members of a protected class.  The twist, however, is that it follows shortly after the Supreme Court's decision in Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015) (Inclusive Communities), and thus requires this Court to consider how that case changed the pleading standards for disparate-impact claims under the Fair Housing Act (FHA).  The Court determines that plaintiff National Fair Housing Alliance (NFHA) has standing, and that under Inclusive Communities' more stringent pleading standard for disparate-impact claims, NFHA has stated a claim under the FHA.  The Court therefore also determines that NFHA has stated a claim under the D.C. Human Rights Act (DCHRA).  Defendants' motion to dismiss will be denied.

## BACKGROUND

Except where noted, the following facts are according to the amended complaint, which the Court accepts as true at this stage.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  NFHA is a non-profit "dedicated to ending discrimination in housing."  See Am. Compl. [ECF No. 12] ¶ 1.  The defendants are two insurers, Travelers Indemnity Corporation and Travelers

Casualty Insurance Company of America (collectively, "Travelers").  Travelers "is one of the largest underwriters of property insurance policies" in the D.C. metropolitan area.  Id. ¶ 18.

NFHA alleges that Travelers has a policy of refusing to provide habitational insurance policies for landlords that rent to tenants who receive Housing Choice Vouchers, commonly known as Section 8 vouchers.  Id. ¶ 21.  As explained below, Housing Choice Vouchers is a federal program that provides financial assistance to low-income persons to obtain housing.  NFHA's allegations are based on the experiences of five "testers," who each "posed as a prospective purchaser of a four unit apartment complex" in the Anacostia neighborhood in southeast D.C. and attempted to obtain insurance.  Id. ¶¶ 22–23, 25.  The testers spoke with "insurance agencies doing business in the District of Columbia that market Travelers insurance policies" between July 2015 and February 2016.  Id. ¶ 23 (listing the insurance agencies).  NFHA employed "experienced tester[s]," id. ¶ 25, "provided a common set of instructions to the individual testers," and recorded the interactions that took place over the telephone, id. ¶ 24.  The testers "advised each broker that the complex was currently occupied by tenants participating in the Housing Choice Voucher program."  Id. ¶ 25.  In each instance, the broker explained to the tester that "Travelers would not underwrite the policy because of the presence of voucher recipients in the building."  Id.; see also id. ¶¶ 26–32 (detailing individual interactions with each of the five brokers).

For example, one broker stated that she would not send the tester's application to Travelers because Travelers "won't write subsidized housing policies."  Id. ¶ 27.  Another broker, who was not initially told that the property was occupied by voucher recipients, first stated that he had spoken with a Travelers' representative and quoted a policy between $3,000 and $3,500.  Id. ¶ 29.  But when the tester then informed the broker that the building was occupied by tenants receiving vouchers, he responded: "Wait a minute.  Stop right there.  Subsidized housing is a problem."  Id.

The broker further expressed his doubt that Travelers would underwrite that policy, but he offered to confirm with Travelers directly.  Id.  The following day, the broker called the tester and conveyed that he spoke with a Travelers representative who stated that Travelers would not underwrite a policy for that building and that "any Section 8 would be a problem."  Id. ¶ 30.  The broker then explained that the tester would likely need to obtain a policy from the secondary market, which would have a premium of approximately $4,500 and would provide "not as good a policy."  Id.  In other words, the broker explained, the tester would be "paying more for less."  Id.

The Housing Choice Voucher program, established by Congress, is "the federal government's major program for assisting very low-income families, the elderly, and individuals with disabilities in affording decent, safe, and sanitary housing in the private rental market."  Id. ¶¶ 9–10 (citing 42 U.S.C. § 1437f(o)).  In the District of Columbia, households that participate in the voucher program are disproportionately headed by African-American women.  According to the complaint, the D.C. population is currently 48.7% non-Hispanic African American or Black and 35.4% non-Hispanic White.  Id. ¶ 14.  Households in D.C. are approximately 45.2% non-Hispanic African American or Black and 41% non-Hispanic White.  Id.  Approximately 47.1% of all households in D.C. are headed by women.  Id.  Within the population of households that receive vouchers, however, African-American households and women-headed households are overrepresented: 92% of participating households are non-Hispanic African American or Black (compared to 45.2% in the whole D.C. population), and only 1% of participating households are non-Hispanic White (compared to 41% in the whole D.C. population).  Id. ¶ 16.  Similarly, 81.5% of households receiving vouchers are headed by women (compared to 47.1% in the whole D.C. population).  Id.  Additionally, "residents who participate in the Housing Choice Voucher program are largely concentrated" in particular neighborhoods: "the four Census tracts in the District with

the highest concentration of Housing Choice Voucher program participants are all east of the Anacostia River, as are eight of the top ten Census tracts." Id. ¶ 17.  These tracts have a far higher concentration of African-American residents than the District as whole: they are 84.7% African-American or Black, as compared to the District-wide average of 51.1%.  Id.  NFHA therefore believes that Travelers' policy of denying insurance to landlords whose tenants receive vouchers discourages landlords from renting to voucher recipients, which has a disproportionate effect on tenants who are African-American or in women-headed households.

Once NFHA became aware of Travelers' allegedly discriminatory policy, it took several steps to investigate the scope of the problem and educate D.C. tenants, landlords, and policy makers about this issue.  It "devoted considerable staff time and resources to efforts to identify the nature and scope of Traveler's [sic] discriminatory conduct."  Id. ¶ 35.  It then "added educational information to its website, along with links" to the relevant federal and state laws "specifically designed to educate the general public . . . about fair housing laws and habitational insurance discrimination based on Housing Choice Voucher program participation."  Id. ¶ 37(a).  It also engaged in targeted outreach specifically designed to inform the people who were likely to be harmed by Travelers' policy.  It "placed a public service announcement in the Washington, DC print edition of the Afro-American, a local weekly newspaper, for two weeks" from February 6 through February 19, 2016, and paid for an email blast to the newspaper's readers during that same time.  Id. ¶ 37(b).  NFHA also created and mailed "educational letter[s] and flyers" to a total of approximately 105 "predominately African American churches in the Washington DC area" in February and March 2016.  Id. ¶ 37(c).

In addition to alerting residents who might be affected, plaintiff "has also taken steps to educate" the D.C. Housing Authority and D.C. landlords "about insurance discrimination based

on Housing Choice Voucher program participation." Id. ¶ 37(d). NFHA's President and Chief Executive Officer addressed the D.C. Housing Authority's monthly board meeting, and other staff members communicated with Housing Authority officials about discrimination in habitational insurance. Id. ¶ 37(d)–(e). The NFHA also designed and implemented additional training to prepare its staff "for the possibility of landlords and tenants calling NFHA for additional information about insurance discrimination" and prepared intake tools to handle an increased volume of calls. Id. ¶ 37(f).

Collectively, according to NFHA, these efforts "diverted scarce time and resources away from routine tasks and activities." Id. ¶ 38. This required NFHA to "delay, suspend, or even forego other existing programs or projects," including suspending planned initiatives to investigate a different "potentially discriminatory loan policy maintained by a specific national lender," to analyze "the conduct of two banks in Kentucky that appeared to be underserving African-American consumers, and the unlawful redlining practices of two Tennessee banks." Id. ¶ 42.

In May 2016, NFHA filed suit, and in August 2016, NFHA filed the operative Amended Complaint. In the Amended Complaint, NFHA alleges that Travelers' discriminatory policy has a disparate impact on African-Americans and women and serves no legitimate business interest, in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq. NFHA also asserts that Travelers' policy violates the D.C. Human Rights Act's prohibition on housing discrimination on the basis of race, sex, and source of income. See D.C. Code § 2-1402.21 (2011). NFHA seeks declaratory and injunctive relief as well as damages and attorney's fees. In response, Travelers filed a motion to dismiss. See Def.'s Mot. to Dismiss [ECF No. 14-1]. Travelers contends that NFHA does not have standing because its only injuries are self-inflicted and because Travelers has ceased using this policy. Travelers also argues that NFHA has failed to plead sufficient facts to show a causal

connection between its policy and any disparate impact under the heightened pleading standards for a prima facie disparate-impact claim following <u>Inclusive Communities</u>.  Travelers contends that the DCHRA is not applicable to insurance and that, even if it were, NFHA has failed to state a claim for discrimination based on race, sex, or source of income under state law for the same reasons that it has failed to do so under federal law.

The Court concludes that NFHA has standing to bring these claims, and that NFHA has sufficiently pleaded a causal connection between Travelers' policy and a disparate impact based on race and sex to make out a prima facie claim under the FHA.  The Court also concludes that the DCHRA does apply to habitational insurance and that NFHA has stated a claim under that act as well.  The Court will therefore deny Travelers' motion to dismiss.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  At the motion to dismiss stage, all of a plaintiff's factual allegations are taken as true.  <u>Bell Atl. Corp.</u>, 550 U.S. at 555.  In order to survive a Rule 12(b)(6) motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  <u>Id.</u> (internal citation omitted).  The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  On a Rule 12(b)(6) motion, the Court generally may not consider documents or materials outside of the pleadings without converting the motion into one for summary judgment.  <u>See</u> <u>Kim v. United States</u>, 632 F.3d 713, 719 (D.C. Cir. 2011).

When considering a motion to dismiss for lack of standing under Rule 12(b)(1), the Court likewise accepts the plaintiff's allegations as true and draws all reasonable inferences in its favor. See Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1107 (D.C. Cir. 2005). However, because the Court has an "affirmative obligation to ensure that it is acting within the scope" of its authority, "'plaintiff's factual allegations . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (2d ed. 1987)). Therefore, in addition to the complaint itself, the Court may examine documents attached to or incorporated in the complaint and matters subject to judicial notice. Settles, 429 F.3d at 1107.

## ANALYSIS

### I.  STANDING

The "irreducible constitutional minimum" of standing requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks omitted) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). In cases brought under the FHA, courts must interpret standing as broadly as possible because "Congress intended standing under the Fair Housing Act to extend to the full limits of Article III." Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982)).

NFHA "can assert standing on its own behalf, on behalf of its members or both." Equal Rights Ctr. v. Post Properties, Inc., 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, NFHA asserts standing only on its own behalf. When an organization asserts its own standing, it must make the

same showing as an individual plaintiff.  Id.  For an organization, "the key issue" is whether it "suffered a 'concrete and demonstrable injury to [its] activities'" rather than "'a mere setback to [its] abstract social interests.'"  PETA v. U.S. Dep't of Agric., 797 F.3d 1087, 1093 (D.C. Cir. 2015) (first alteration in original) (quoting Equal Rights Ctr., 633 F.3d at 1138).  This can be demonstrated by showing that the plaintiff "had to devote significant resources to identify and counteract the defendant's racially discriminatory" practices.  Havens Realty Corp., 455 U.S. at 379.  Thus, the Supreme Court "has made plain that a 'concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests' and thus suffices for standing."  PETA, 797 F.3d at 1093 (alteration in original) (quoting Havens Realty Corp., 455 U.S. at 379); see also Am. Legal Found v. FCC, 808 F.2d 84, 92 (D.C. Cir. 1987) ("the organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions.").

In contrast, an organization has not suffered an injury in fact sufficient to establish standing if it has only diverted "resources to litigation or to investigation in anticipation of litigation." PETA, 797 F.3d at 1093; see also Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc., 659 F.3d 13, 25 (D.C. Cir. 2011).  "Otherwise, the very act of bringing a case would confer standing 'and Article III would present no real limitation.'"  Equal Rights Ctr., 633 F.3d at 1138 (quoting Spann, 899 F.2d at 27).  Nor can an organization claim injury from "the effect of the [challenged] regulations on the organizations' lobbying activities."  PETA, 797 F.3d at 1093 (internal quotation marks omitted) (quoting Ams. for Safe Access v. DEA, 706 F.3d 438, 457 (D.C. Cir. 2013)).  Similarly, an organization's expenditure of resources to engage in "pure issue-advocacy" cannot create standing.  Ctr. for Law & Educ. v. U.S. Dep't of Educ., 396 F.3d 1152,

1162 (D.C. Cir. 2005); see also Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015);

PETA, 797 F.3d at 1094.

Here, NFHA's activities fit squarely within the category of expenditures that are sufficient to confer standing.  In Havens, the Supreme Court held that an organization opposing housing discrimination had standing when it "devote[d] significant resources to identify and counteract" a real estate company's "racially discriminatory steering practices."  Havens, 455 U.S. at 379.  In Spann, the D.C. Circuit applied Havens and held that "[e]xpenditures to reach out to potential home buyers or renters who are steered away from housing opportunities by discriminatory advertising, or to monitor and to counteract on an ongoing basis public impressions created by defendants' use of print media, are sufficiently tangible to satisfy Article III's injury-in-fact requirement."  Spann, 899 F.2d at 29.  Here, as in Spann, NFHA created new educational materials and posted them on its website, purchased a public-service advertisement in a newspaper targeted toward the population to be harmed by Travelers' policy, and paid for an email blast to the newspapers' readers.  Am. Compl. ¶ 37(a), (b).  NFHA also spent funds and staff time on designing new educational letters and flyers and mailing them to approximately 105 "predominately African American churches in the Washington DC area."  Id. ¶ 37(c).

Moreover, the D.C. Circuit has "concluded that an organization promoting equal employment had standing to sue an employment agency for racial discrimination in hiring because the alleged discrimination 'might increase the number of people in need of counseling' and 'may have reduced the effectiveness of any given level of [the organization's outreach efforts.'"  Equal Rights Ctr., 633 F.3d at 1139 (quoting Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276 (D.C. Cir. 1994)).  NFHA diverted its resources to provide additional training for staff and develop tracking and intake procedures to prepare for a potential

increased volume of calls by landlords and tenants regarding insurance-related housing discrimination.  Id. ¶ 37(f).  Thus, NFHA has certainly pleaded sufficient facts to show that it suffered a concrete injury-in-fact by diverting scarce resources to "counteract the defendant's racially discriminatory" practices.  See Havens Realty Corp., 455 U.S. at 379.

Travelers raises a host of arguments for why, despite the clear case law explained above, NFHA does not have standing.  None are persuasive.  Travelers first asserts that because NFHA's expenditures were voluntary and self-inflicted, they do not "constitute the requisite injury-in-fact to establish standing."  Def.'s Mot. to Dismiss at 27 (citing PETA, 787 F.3d at 1096–97, and Turlock Irrigation Dist., 786 F.3d at 24).  But the D.C. Circuit has rejected this argument, explaining that standing does not "depend on the voluntariness or involuntariness of the plaintiffs' expenditures" but instead on "whether they undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination rather than in anticipation of litigation."  Equal Rights Ctr., 633 F.3d at 1140.  Here, as explained above, NFHA expended significant resources to "counteract[] the effects of defendants' alleged discrimination."  See id. Although some of NFHA's activities could be classified as preparing for litigation (or as engaging in advocacy, another category of expenses that does not count toward standing), the Court does not rely on those activities in finding that NFHA has standing.

Travelers next argues that NFHA's choice to divert its resources was "predicated on the legal conclusion that Travelers' conduct violated the fair housing laws," but because Travelers did not violate the law, NFHA "cannot manufacture standing."  Def.'s Mot. to Dismiss at 28–29.  This argument puts the cart before the horse: NFHA's standing does not depend on whether it prevails on the merits.  Rather, at the motion to dismiss stage, the Court accepts the plaintiff's allegations as true and "[i]f, as broadly alleged," defendant's unlawful practices "have perceptibly impaired"

the plaintiff's ability to provide services, "there can be no question that the organization has suffered injury in fact." <u>Havens</u>, 455 U.S. at 363; <u>see also</u> <u>Lujan</u>, 504 U.S. at 56 ("[E]ach element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.  At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" (internal citations omitted)).

Travelers also attaches an affidavit to its motion to dismiss attesting that since January 1, 2016, it no longer uses the policy that NFHA challenges.  <u>See</u> Kearney Decl. [ECF No. 14-2] ¶ 3. Travelers therefore argues that "the costs expended by NFHA are not the result of Travelers' conduct, but of NFHA's own failure to perform a reasonable investigation."  Def.'s Mot. to Dismiss at 30.  It is not clear how this affidavit could affect NFHA's standing.  Travelers' admission that it used this policy prior to January 1, 2016 will likely bolster's NFHA's claims at a later stage of this litigation.  But regardless, NFHA has pleaded facts, which must be accepted as true at this stage, that show that Travelers still followed this policy as of February 2016.  <u>See</u> Am. Compl. ¶ 32.  At best, then, the affidavit raises a factual dispute that could be relevant to the merits of NFHA's claims—but it does not affect NFHA's standing.

Finally, Travelers argues that because the activities NFHA undertook to counteract Travelers' allegedly discriminatory practices are "wholly consistent with the very type of education and outreach efforts that are part of NFHA's stated mission," they cannot suffice for injury in fact.  Def.'s Mot. to Dismiss at 26.  A different judge on this court responded to a similar argument by stating that "[t]he Court need not address defendants' theory," which "borders both on the offensive and absurd."  <u>National Fair Hous. Alliance, Inc. (NFHA) v. Prudential Ins. Co. of Am.</u>, 208 F. Supp. 2d 46, 53–54 (D.D.C. 2002).  This Court need only remark that in nearly all of the cases where an organization has standing to pursue a claim under the FHA, of course those

organizations' activities are "wholly consistent" with their mission of promoting fair housing.  See, e.g., Havens, 455 U.S. at 368; Equal Rights Ctr., 633 F.3d at 1136; Spann, 899 F.2d at 26; cf. Inclusive Communities, 135 S. Ct. at 2514 (not considering standing, but describing plaintiff as  a "Texas-based nonprofit corporation that assists low-income families in obtaining affordable housing").   Indeed, it would be surprising if an organization with no interest in housing discrimination were to bring suit under the FHA, and more importantly, nothing in the FHA, standing jurisprudence, or common sense supports Travelers' position.

Having determined that NFHA has standing to pursue its claims, the Court turns to defendant's motion to dismiss for failure to state a claim.

## II.     THE FAIR HOUSING ACT

The Fair Housing Act was enacted during "a period of considerable social unrest." Inclusive Communities, 135 S. Ct. at 2516.  A commission established by President Lyndon Johnson found that "both open and covert racial discrimination prevent black families from obtaining better housing and moving to integrated communities" and that as a result, "'our Nation is moving toward two societies, one black, one white—separate and unequal.'"  Id. (quoting Report of the Nat'l Advisory Comm'n on Civil Disorders 1, 91 (1968)).  This state of affairs came about because of "various practices [that] were followed, sometimes with government support, to encourage and maintain the separation of the races: Racially restrictive covenants prevented the conveyance of property to minorities; steering by real-estate agents led potential buyers to consider homes in racially homogeneous areas; and discriminatory lending practices, often referred to as redlining, precluded minority families from purchasing homes in affluent areas."  Id. at 2515 (internal quotation marks omitted).    In response, Congress adopted the commission's

recommendation and passed the Fair Housing Act to "eradicate discriminatory practices within a sector of our Nation's economy." Id. at 2521.

The FHA announces that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." See 42 U.S.C. § 3601. Thus, it is unlawful to "refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). In Inclusive Communities, the Supreme Court reached the same conclusion as many of the circuit courts and held that the FHA creates liability under a disparate-impact theory of discrimination as well as under a disparate-treatment theory. Inclusive Communities, 135 S. Ct. at 2525. "The availability of disparate-impact liability" both "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment" and promotes the "removal of artificial, arbitrary, and unnecessary barriers" to housing. Id. at 2522 (internal quotation marks omitted).

But the Supreme Court carefully explained that "disparate-impact liability has always been properly limited." Id. Disparate-impact liability under the FHA can be proven under a burden-shifting framework analogous to that used in employment discrimination cases: the plaintiff must plead a prima facie case of discrimination, the defendant may rebut by presenting non-discriminatory reasons for the challenged policy, and the plaintiff bears the ultimate burden of persuasion. See 24 C.F.R. § 100.500(c); Inclusive Communities, 135 S. Ct. at 2522–23. Because this case is at the motion to dismiss stage, the limitations at the prima facie stage are relevant here.

The Supreme Court explained that there is a "robust causality requirement" at the prima facie stage: "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."

Inclusive Communities, 135 S. Ct. at 2523.  A claim "that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity"—in other words, a "one-time decision [that] may not be a policy at all" cannot support a disparate-impact claim.  Id.  In Inclusive Communities, where the plaintiff claimed a developer's choice of location for a new housing complex had a disparate impact, the Court explained that "[i]t may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct . . . housing units."  Id. at 2523–24.  Other limitations on disparate-impact liability take effect at different stages—for example, defendants must have "leeway to state and explain the valid interest served by [the challenged] policies" at the rebuttal stage.  Id. at 2522. Keeping in mind the ultimate purpose of disparate-impact liability, the Court reiterated that "[g]overnmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'"  Id. at 2524 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)).  Thus, "[c]ourts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision."  Id.

Travelers asserts that under Inclusive Communities' robust causality requirement, NFHA has failed to state a claim because failing to provide habitational insurance to a landlord is too remote to have any effect on a tenant and because NFHA relies on statistical evidence to demonstrate the disparate impact of Travelers' policy.  As explained below, these arguments are unpersuasive.

There is a large body of case law holding that insurers—including insurers who sell products to landlords—can be held liable under the FHA, and Inclusive Communities does not call those cases into question.  Courts have long recognized the role of insurance in housing discrimination.  One classic form of racial discrimination is "redlining," which in the insurance

14

industry is "charging higher rates or declining to write insurance for people who live in particular areas." NAACP v. Am. Fam. Mut. Ins. Co., 978 F.2d 287, 290 (7th Cir. 1992). Numerous courts have applied disparate-impact liability to insurers that provide (or don't provide) insurance to homeowners or renters. See, e.g., id. at 301; Nationwide Mut. Ins. Co v. Cisneros, 52 F.3d 1351, 1358–59 (6th Cir. 1995); NFHA, 208 F. Supp. 2d at 55–58.[1] This interpretation makes sense: "insurance provides the financial assistance necessary to maintain a dwelling," NFHA, 208 F. Supp. 2d at 58, and thus denial of insurance has the effect of making housing "otherwise . . . unavailable," 42 U.S.C. § 3604(a). Indeed, the Department of Housing and Urban Development has issued a regulation stating that denying "property or hazard insurance" violates the FHA. 24 C.F.R. § 100.70(d)(4).[2] Moreover, many courts have considered similar issues to that which Travelers raises here—whether refusing to provide insurance to the landlord (rather than to the tenant) can violate the FHA—and concluded that it can. See, e.g., Viens v. Am. Empire Surplus Lines, Inc., 113 F. Supp. 3d 555, 565–66 (D. Conn. 2015); Nevels v. W. World. Ins. Co., 359 F. Supp. 2d 1110, 1117–1120 (W.D. Wash. 2004); Wai v. Allstate Ins. Co., 75 F. Supp. 2d 1, 6–7 (D.D.C. 1999).

Travelers does not argue that these cases were wrongly decided or attempt to distinguish its factual circumstances from the ones presented there. Rather, it argues that the reasoning in these cases is no longer sound given Inclusive Communities' "robust causality requirement." 135 S. Ct. at 2523. But Inclusive Communities said no such thing. The Supreme Court was concerned

---

[1] As far as the Court is aware, only one court has ever held that the FHA does not cover insurance at all. See Mackey v. Nationwide Ins. Co., 724 F.2d 419, 424 (4th Cir. 1984). However, it is unclear whether this case is still good law given intervening changes in the statute and HUD regulations. See NAACP, 978 F.2d at 300 (doubting Mackey's continued force after Congress' 1988 amendments to the FHA); NFHA, 208 F. Supp. 2d at 55 (doubting Mackey's continued weight after HUD's 1989 regulations).

[2] Travelers does not cite or discuss this regulation, or present any argument regarding whether this regulation is entitled to deference under Chevron USA, Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). The Court therefore does not consider how much deference is owed to this regulation.

with ensuring that disparate-impact liability does not lead to "inject[ing] racial considerations into every housing decision" by allowing bare statistics to state a prima facie claim without evidence of a "causal connection," or by allowing one-time decisions to be challenged as discriminatory policies, such that governments and private parties cannot implement reasonable policy priorities in their housing plans.  See id. at 2523–24.  But it does not require courts to abandon common sense or necessary logical inferences that follow from the facts alleged.  Indeed, quite the opposite—the Supreme Court instructed courts to ensure that disparate-impact liability is confined to removing "artificial, arbitrary, and unnecessary barriers."  Id. at 2524 (internal quotation marks omitted).

The Seventh Circuit explained the clear, non-speculative, and inescapable consequences that follow from a lack of habitational insurance: "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."  NAACP, 978 F.2d at 297.  As another court in this district explained when considering housing discrimination against disabled tenants, it does not matter whether the denial of insurance is to the landlord or the tenant: "If, in order to rent to disabled persons, a landlord must risk losing her home through loss of . . . insurance, she will be disinclined to rent to disabled persons.  Such powerful disincentives to rent to disabled persons make housing unavailable to them."  Wai, 75 F. Supp. 2d at 6.  Hence, insurance policies can create exactly the type of "artificial, arbitrary, and unnecessary barriers" to housing that disparate-impact liability is suited to address.  See Inclusive Communities, 135 S. Ct. at 2524.  The arguments in these cases, then, apply with full force to Travelers.  Here, NFHA alleges that Travelers refuses to provide insurance to landlords who rent to voucher recipients.  And importantly, these are the type of clear, non-speculative, connections that Inclusive Communities requires to make out a prima facie claim of disparate impact.  Accordingly, nothing about the fact

that Travelers offers insurance, rather than directly selling or renting property, makes the causal connection too weak for NFHA to state a claim under Inclusive Communities.

To support its contention that the connection between an insurer's policies and any effect on tenants is too attenuated to state a claim, Travelers points out that NFHA has not identified any specific tenant who has been or would be harmed by Travelers' policy.  It is true that NFHA's complaint does not identify any individual tenant who has (or is likely to) lose housing due Travelers' policy, nor has NFHA identified any building that ceased (or will cease) renting to tenants who receive vouchers.  But this has little legal relevance here.  For standing purposes, NFHA must identify a party with an actual injury—which it has done.  For the purpose of stating a claim, Travelers does not cite any case holding that an organizational plaintiff must identify a specific tenant harmed by the challenged policy.  To the contrary, both the Supreme Court and lower courts have permitted organizational plaintiffs to proceed by identifying the category of persons who will be harmed by the challenged policy without naming the specific impacted tenants (again, once standing has been demonstrated).  See, e.g., Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 97–98, 109–111 (1979); Avenue 6E Investments, LLC v. City of Yuma, 217 F. Supp. 3d 1040, 1051 (D. Ariz. 2017) (explaining that Ninth Circuit precedent "does not require Plaintiffs to identify those people who were actually affected by the rezoning denial. . . . [P]roof of a predictably discriminatory effect is sufficient"); Viens, 113 F. Supp. 3d at 559–560; Wai, 75 F. Supp. 2d at 3–4.  While identifying a specific tenant harmed by Travelers' policy might help convince a jury or judge of the merits of NFHA's factual claims, it is not necessary for demonstrating causation at the prima facie stage.[3]

---

[3] Travelers also argues that NFHA cannot show causation because the Housing Choice Voucher program is voluntary for landlords to participate in.  The Court need not spend much time on this argument, and does not decide the extent to which participation is voluntary or a landlord's withdrawal from the program could lead to liability under the FHA.  NFHA here has not alleged that any landlord is required to participate in the Housing Choice Voucher

Travelers' next argument is a stronger one: it asserts that NFHA relies on the type of bare "showing of statistical disparity" that is insufficient for a prima facie claim under <u>Inclusive Communities</u>.  Only a handful of cases since <u>Inclusive Communities</u> have closely examined when statistical evidence demonstrates a sufficiently close causal connection to state a claim.  In <u>Rhode Island Commission for Human Rights v. Graul</u>, the court noted that "disparate impact is proven by presentation of evidence compar[ing] those affected by the policy with those unaffected by the policy."  120 F. Supp. 3d 110, 124 (D.R.I. 2015) (internal quotation marks omitted) (alteration in original).  There, the plaintiffs were a family comprised of two parents and a child, who alleged that their landlord's policy of not renting a one-bedroom apartment to three people violated the FHA's prohibition against discrimination based on family status.  On a motion for summary judgment, the court held that they stated a prima facie case by presenting analysis based on state-wide census data that showed that for three-person households renting at that price range, "households with children are more than three times as likely to be adversely impacted" by the landlord's policy than "comparable households with no children."  <u>Id.</u> at 126.

In <u>Mhany Management, Inc. v. County of Nassau</u>, 819 F.3d 581, 619–620 (2d Cir. 2016), the Second Circuit held that the district court's 2012 analysis of the plaintiff's prima facie claim was still valid following <u>Inclusive Communities</u>.  The circuit court affirmed the district court's conclusion that the plaintiff showed a disparate impact by demonstrating that the zoning rule limiting multi-family dwellings "perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately

---

program or that any landlord's withdrawal from the program is unlawful.  Rather, it alleges that the insurer's policy <u>prevents</u> landlords from participating in the Housing Choice Voucher program, and thus violates the FHA.  Travelers' argument is therefore not relevant to NFHA's claim.  <u>Cf.</u> <u>Viens</u>, 113 F. Supp. 3d at 572 ("[e]ven if landlords have the prerogative under federal law to reject Section 8 tenants, there is no sound reason why insurers should be immunized from claims of discrimination when such landlords have decided to accept Section 8 tenants").

only 4.1% of the overall population . . . and only 2.6% of the population living in [single family] households." Id. at 620 (first alteration original) (internal quotation marks omitted).  The initial district court opinion further detailed the statistical evidence, which tended to show that the challenged zoning rule, as opposed to an alternative zoning rule, "significantly decreased the potential pool of minority residents likely to move into" the new housing development "in proportion to the number of non-minorities affected." Mhany Mgmt., Inc. v. County of Nassau, 843 F. Supp. 2d 287, 329 (E.D.N.Y. 2012).

And in Avenue 6E Investments, LLC v. City of Yuma, 217 F. Supp. 3d 1040 (D. Ariz. 2017), the district court considered whether statistical evidence at the summary judgment stage made out a prima facie claim after the Ninth Circuit ordered a remand following Inclusive Communities.  See Avenue 6E Investments, LLC v. City of Yuma, 818 F.3d 493, 512 (9th Cir. 2016).  The plaintiffs alleged that a lower-density zoning rule would lead to more expensive houses which would have a disparate impact on Hispanics. Avenue 6E Investments, 217 F. Supp. 3d at 1048.  The plaintiffs' expert "compare[d] the percentages of Hispanics and whites who were qualified home buyers in the identified price ranges in the Yuma market" during 2007–2009. Id. at 1049.  The expert determined that "the pool of persons purchasing a home in [the developer's] proposed price range [for higher-density housing] was roughly 45% Hispanic and 50% white, while the pool of persons purchasing a home in the more expensive range [for lower-density housing] was roughly 30% Hispanic and 65% white." Id. at 1049.  Hence, the court concluded "that Plaintiffs' evidence is sufficient to show a prima facie case of disparate impact." Id. at 1050. The court explained that "Plaintiffs did not just show that the denial of a request to lower the density increases housing costs and that Hispanics are generally less wealthy than whites in

Yuma."  Id.  Rather, the plaintiff "provided statistical evidence" that was specific to the "relevant market area" and the "relevant time frame."  Id.

In contrast, two cases where courts have found that plaintiffs failed to meet their pleading burden after Inclusive Communities are also instructive.  In Boykin v. Fenty, 650 F. App'x 42, 43 (D.C. Cir. 2016) (per curiam) (nonprecedential), 42 former residents of a homeless shelter challenged the city's decision to close two low-barrier homeless shelters in the northwest quadrant of the city, alleging that it would have a disparate impact on disabled homeless individuals.  The court determined that they "failed to allege facts suggesting that the closure affected a greater proportion of disabled individuals than non-disabled" because the complaint "did not, for instance, include an allegation that disabled homeless individuals are more likely to rely on low-barrier shelters than non-disabled homeless individuals."  Id. at 44.  And in Burbank Apartment Tenants Ass'n v. Kargman, 48 N.E.3d 394, 398 (Mass. 2016), the Massachusetts Supreme Judicial Court considered a disparate impact claim against a landlord who switched from participating in a program for low-income tenants (known as project-based subsidies) to instead accepting Section 8 vouchers.  The court considered the FHA and the analogous state statue under Inclusive Communities.  Id. at 411.  It explained that while the plaintiffs pleaded facts that showed that the beneficiaries of project-based subsidies were more likely to be members of protected classes as compared to the general public, it did not show that they were more likely to be members of a protected class as compared to voucher recipients.  See id. at 412–13.  Moreover, because the property would still rent to voucher recipients, the plaintiffs did not present evidence that those tenants would be "negatively affected" by the switch from project-based subsidies to vouchers. Id. at 414.

Travelers asks the Court to rely on Ellis v. City of Minneapolis, No. 14-cv-3045, 2016 WL 1222227 (D. Minn. Mar. 28, 2016).  There, the plaintiffs were private landlords of low-income housing who alleged that the city had a policy of over-enforcing housing codes against them, as compared to the relaxed enforcement against publicly owned low-income housing.  Id. at *1. Travelers identifies that case as one where plaintiffs alleged that low-income tenants were more likely to be members of a protected class, yet the court rejected the claim because plaintiffs' complaint "[did] not point to a defendant's policy and purported disparity and allege facts that a show a causal connection."  Id. at *5.

But Travelers misunderstands the district court's analysis and does not consider the more recent decision from the Eighth Circuit on appeal.  The district court in Ellis explained that the key problem with plaintiffs' allegations was that they failed to show that the city had a policy that could cause a disparate impact.  Id. at *6.  Indeed, "Plaintiffs admit[ted] that the units were not up to code" thus undermining their claim that the city had a policy of unfairly enforcing housing codes.  Id.  The Eighth Circuit, on appeal, emphasized this element of the district court's analysis. Ellis v. City of Minneapolis, 860 F.3d 1106, 1112–13 (8th Cir. 2017).  It explained that the FHA may not be used as "'an instrument to force housing authorities to reorder their priorities,' and an FHA disparate-impact claim may not be used to lower housing standards for everyone merely because housing standards are inconsistently applied."  Id. at 1112 (internal citation omitted) (quoting Inclusive Communities, 135 S. Ct. at 2522).  Most importantly, the Eighth Circuit affirmed the district court's decision because the facts alleged did not "plausibly suggest a City policy to misapply the housing code."  Id. at 1113 (emphasis in original).  This is not surprising, given Inclusive Communities' admonition that a "one-time decision may not be a policy at all" and therefore cannot support a disparate-impact claim.  135 S. Ct. at 2523.  In this case, however,

there is no dispute that NFHA has alleged that Travelers has a policy that has a disparate impact, and thus Ellis is not helpful to either party on that issue and provides little guidance regarding NFHA's statistical analysis.

Here, NFHA has pleaded facts that are far closer to those in Graul, Mhany Management and Avenue 6E Investments than to Boykin or Burbank.  Unlike in Boykin and Burbank, NFHA did not just allege that some voucher recipients are members of a protected class, but rather pleaded facts that show that voucher recipients are significantly more likely to be members of a protected class than is true for the D.C. population as a whole.  See Am. Compl. ¶¶ 14–17; Boykin, 650 F. App'x at 44; Burbank Apt. Tenants Ass'n, 48 N.E.3d at 413–14.  As in Avenue 6E Investments, NFHA not only conducted a general statistical analysis, but also focused on the relevant geographic region of the District: it ensured that testers claimed they were buying properties in the Anacostia neighborhood, which is also the area with the highest portion of voucher recipients.  See Am. Compl. ¶ 17; Avenue 6E Investments, 217 F. Supp. 3d at 1049–50.  And as in Graul and Mhany Management, NFHA pleaded facts that show that because of the different composition of the affected population (voucher recipients) as compared to the District's population as a whole, members of a protected class are more likely to be harmed by Travelers' policy than are other individuals.  See Graul, 120 F. Supp. 3d at 126; Mhany Mgmt., 843 F. Supp. 2d at 329.

"[T]here is no rigid mathematical formula to show specific disparate impact and the inquiry is necessarily fact-specific."  Avenue 6E Investments, 217 F. Supp. 3d at 1050 (citing Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)).  Here, based on a fact-specific inquiry, NFHA has pleaded facts that, if true, would show that Travelers' policy will exacerbate racial and sex-based disparities by having a disproportionate impact on African-American residents and

members of women-headed households in the District.  NFHA has therefore stated a prima facie

FHA claim under the "robust causality requirement" of <u>Inclusive Communities</u>.[4]

### III.    THE D.C. HUMAN RIGHTS ACT

The D.C. Human Rights Act identifies several actions that are "unlawful discriminatory

practice[s]" if undertaken "wholly or partially for a discriminatory reason based on actual or

perceived: race, color, religion, national origin, sex, . . . [or] source of income."  D.C. Code § 2-

1402.21(a).  One such category of actions is: "[t]o appraise a property, refuse to lend money,

guarantee a loan, purchase a loan . . . or otherwise refuse to make funds available for the purchase,

acquisition, construction, alteration, rehabilitation, repair or maintenance of real property; or

impose different conditions on such financing; or refuse to provide title or other insurance relating

to the ownership or use of any interest in real property."  <u>Id.</u> § 2-1402.21(a)(3).  NFHA argues that

Travelers' policy has a disparate impact based on race, sex, and source of income in violation of

this provision of the DCHRA.

---

[4] In a footnote, Travelers argues that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–15, bars NFHA's claims.  <u>See</u> Def.'s Mot. to Dismiss at 16–17 n.9.  The McCarran-Ferguson Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."  15 U.S.C. § 1012(b).  The Supreme Court has explained the threshold requirements for preemption under that act: (1) the federal law in question must not be "specifically relat[ed] to the business of insurance"; (2) there is a state law enacted "for the purpose of regulating the business of insurance,"; and (3) application of the federal law would "invalidate, impair, or supersede the State's law."  <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299, 307 (1999) (internal quotation marks omitted).  The Eighth Circuit, in analyzing the FHA and the McCarran-Ferguson Act, explained that under "<u>Humana</u>'s fact-intensive interpretation of the word 'impair,' [a court's] focus must be on the precise federal claims asserted.  Federal civil rights statutes are drafted broadly, so a statute might 'impair' state insurance laws when applied in some ways, but not in others."  <u>Saunders v. Farmers Ins. Exch.</u>, 537 F.3d 961, 967 (8th Cir. 2008).  Thus, the key issue in analyzing whether the McCarran-Ferguson Act reverse-preempts this application of the FHA is the specific details of the <u>state insurance law</u> that supposedly contradicts the FHA.  But Travelers has not identified any specific state insurance law that might contradict this application of the FHA, or explained how the laws are incompatible.  Rather, it has only cited the D.C. insurance code as a whole, and the section of that code generally pertaining to rate making.  <u>See</u> Def.'s Mot. to Dismiss at 16–17 n.9 (citing D.C. Code §§ 31-2231.01 <u>et seq.</u> and 31-2703).  Undeveloped arguments are waived because "it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel."  <u>Sanchez v. Miller</u>, 792 F.2d 694, 703 (7th Cir. 1986); <u>see also</u> <u>Johnson v. Panetta</u>, 953 F. Supp. 2d 244, 250 (D.D.C. 2013).  The Court therefore considers this argument waived and does not decide whether, under the McCarran-Ferguson Act, any D.C. insurance law might bar this application of the FHA.

Travelers argues that the DCHRA does not cover the issuance of insurance, and therefore that NFHA may only state a discrimination claim under the D.C. insurance code. Def.'s Mot. to Dismiss at 21–22. Travelers relies on <u>National Organization for Women (NOW) v. Mutual of Omaha Insurance Co., Inc.</u>, 531 A.2d 274, 275 (D.C. 1987), for this proposition. But that case says something entirely different. Regardless of whether <u>NOW</u> analyzed only health insurance or insurance more generally (which the parties disagree on), it undoubtedly only considered whether insurance was a public accommodation under the DCHRA. <u>Id.</u> at 276. The DCHRA contains a particular prohibition on discrimination in public accommodations—at the time codified in § 1-2519(a)(1) (1987) and now codified in nearly identical language in § 2-1402.31(a)(1) (2011). The public accommodations provision is an entirely separate section from the one at issue here, which pertains to housing and commercial space, codified at § 2-1402.21(a). And importantly, the act specifies that § 2-1402.21(a) applies to habitational insurance: it states that it shall be unlawful to discriminate in "other insurance relating to the ownership or use of any interest in real property." D.C. Code §2-1402.21(a)(3). There can be no serious question, then, that § 2-1402.21(a) applies to the provision (or denial) of habitational insurance.

Travelers next contends that because the DCHRA is interpreted in accordance with the FHA, <u>Inclusive Communities</u>' heightened pleading requirements apply. Def.'s Mot. to Dismiss at 20–23 (citing <u>McCaskill v. Galludet Univ.</u>, 36 F. Supp. 3d 145, 157 (D.D.C. 2014); <u>Feemster v. BSA Ltd. P'ship</u>, 548 F.3d 1063, 1070 (D.C. Cir. 2008)). It therefore argues that, for all of the reasons NFHA has failed to state a claim under the FHA, it has failed to state a claim under the DCHRA as well. <u>Id.</u> The Court assumes without deciding that the FHA's pleading limitations for disparate-impact claims, as interpreted in <u>Inclusive Communities</u>, apply to disparate-impact claims

under the DCHRA.  But these arguments fail here for the same reasons that they fail with respect to the FHA.  NFHA has therefore stated a claim under the DCHRA as well.

## **<u>CONCLUSION</u>**

For these reasons, Travelers' motion to dismiss will be denied.  A separate order has been issued on this date.

_/s/_
JOHN D. BATES
United States District Judge

Dated: <u>August 21, 2017</u>